## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

ERIK CURTIS RAUSCH,

     Plaintiff,

v.                                                          Case No.  1:18-cv-231-AW/MJF

COMMISSIONER OF SOCIAL
SECURITY,

     Defendant.

_____/

## **REPORT AND RECOMMENDATION**

Plaintiff Erik Curtis Rausch seeks review of a final adverse decision of the Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g). The Commissioner denied his applications for Disability Insurance Benefits and Supplemental Security Income. Plaintiff timely pursued and exhausted his administrative remedies. The Commissioner's decision fails to provide sufficient reasoning for determining that the proper legal analysis has been conducted. The undersigned, therefore, respectfully recommends that the decision of the Commissioner be reversed and remanded.[1]

_____

[1] This case was referred to the undersigned pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 71.1(A), 72.2(D) and 72.3 of this court.

## I.  Procedural History

On March 18, 2015, Plaintiff filed an application for a period of disability and Disability Insurance Benefits ("DIB"). (Tr. 11). He also filed a claim for Supplemental Security Income ("SSI"). (*Id.*). On June 19, 2015, these claims were initially denied. On September 22, 2015, the claims were denied on reconsideration. (*Id.*). On October 29, 2015, Plaintiff requested a hearing before an administrative law judge ("ALJ"). (*Id.*). On February 1, 2018, the assigned ALJ conducted a video hearing. On February 20, 2018, the ALJ issued a decision in which he found Plaintiff "not disabled" as defined under the Social Security Act ("Act"), 42 U.S.C. § 401, *et seq.*, at any time through the date of his decision. (Tr. 11-23). On September 18, 2018, the Appeals Council denied review. (Tr. 1-3). Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court. *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1262 (11th Cir. 2007). This appeal followed.

## II.  Findings of the ALJ

In denying Plaintiff's claims, the ALJ made the following findings relevant to the issues raised in this appeal:

(1) Plaintiff met the insured status requirements of the Social Security Act ("Act") through March 31, 2017.

(2) Plaintiff had not engaged in substantial gainful activity since January 1, 2015, the alleged onset date.

(3) Plaintiff had the severe impairments of osteoarthritis and affective mood disorder and the non-severe impairment of attention deficient hyperactivity disorder ("ADHD").

(4) Plaintiff's impairments individually, or combined, did not meet or medically equal the severity of one of the listed impairments.

(5) Plaintiff had the residual functional capacity ("RFC") to perform medium work except he was limited to only being able to perform simple, routine tasks on a sustained basis and must avoid fast-paced production and quota requirements.

(6) There were a significant number of jobs in the national economy that Plaintiff could perform with his RFC.

(7) Plaintiff was not disabled from January 1, 2015, through the date of the decision.

## III.   Standard

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence

or that proper legal standards were not applied."); *see also Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if, in light of the record as a whole, the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); *Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998); *Lewis*, 125 F.3d at 1439; *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995).

Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217 (1938)); *Lewis*, 125 F.3d at 1439. The reviewing court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision

must be affirmed if supported by substantial evidence. *Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability, the physical or mental impairment must be so severe that the claimant is unable to do not only his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A). Pursuant to 20 C.F.R. § 404.1520(a)-(g),[2] the Commissioner analyzes a disability claim in five steps:

1.    If the claimant is performing substantial gainful activity, he is not disabled.

2.    If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

---

[2] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims. *See* 20 C.F.R. §§ 404, 416. Therefore, citations in this report and recommendation should be considered to refer to the appropriate parallel provision. The same applies to citations of statutes or regulations found in quoted court decisions.

3.     If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.     If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.     Even if the claimant's impairments prevent him from performing past relevant work, if other work exists in significant numbers in the national economy that accommodates his RFC and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. *MacGregor v. Bowen*, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner. *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    **Plaintiff's Employment and Medical History**

A.    <u>**Relevant Medical History**</u>

Prior to Plaintiff's onset date, Plaintiff was treated by a psychiatrist, Dr. Edmund Rivera, M.D., for bipolar disorder type II, attention hyperactivity disorder, and anxiety disorder. (Tr. 280-87). Dr. Rivera treated Plaintiff from May 2012 through July 2013.

From July 2013 through August 2014, Plaintiff was treated by another psychiatrist, Dr. Guido Nodal, M.D. (Tr. 389-458). In July 2013, Plaintiff presented to Dr. Nodal and stated that he had been living in Key West for about a month. Plaintiff reported that he was unemployed and was being supported by his parents. (Tr. 449). Plaintiff further reported that he experimented with marijuana, cocaine, LSD, mushrooms, ecstasy, OxyContin, and alcohol. He stated that he had not used any drugs for about one and one-half years, but that he continued to drink socially. (*Id.*). Dr. Nodal noted that Plaintiff was "very hard to interview" and had a "hard time focusing and staying on task." (Tr. 448-49). Plaintiff's mood was a bit labile. He was tangential and his concentration was poor. (Tr. 449). Dr. Nodal stated that Plaintiff's memory seemed to be intact, but Plaintiff had "some issues putting dates together in the past." (*Id.*). Dr. Nodal diagnosed Plaintiff with ADHD, obsessive-compulsive disorder, depressive disorder, and history of polysubstance abuse. (Tr.

450). Dr. Nodal adjusted Plaintiff's medication regimen. (Tr. 450-51). Plaintiff continued with monthly office visits.

In August 2013, Plaintiff had two office visits. On August 9, 2013, Plaintiff, accompanied by his parents, met with Dr. Nodal. (Tr. 444-45). At this examination, Plaintiff's parents informed Dr. Nodal that Plaintiff had suffered bouts of extreme depression for four to five days. They also described periods of "mania of being extremely grandiose with racing thoughts and wanting to overspend and making a lot of irrelevant plans." (Tr. 444). Dr. Nodal indicated that Plaintiff was argumentative at times and his parents had to calm him. His mood was "a little labile." (*Id.*). Dr. Nodal diagnosed him as suffering from bipolar disorder. (*Id.*).

On August 19, 2013, Plaintiff reported that he had been feeling sad for a few days. (Tr. 440). Plaintiff explained that he had spent the last three or four days in bed, only getting up to eat. (*Id.*). Dr. Nodal's notes reflect that upon mental status examination, Plaintiff's mood was sad. (*Id.*). Plaintiff's affect was congruent, and his thought processes were logical. Dr. Nodal observed that Plaintiff "was in a depressed state at this time." (*Id.*). Dr. Nodal prescribed lithium.

At office visits from September 3, 2013 through January 21, 2014, Plaintiff reported doing well and mental status examination results showed that Plaintiff indeed was doing well. (Tr. 436, 432, 427). On September 3, 2013 Plaintiff opined that "Lithium was a miracle drug" and was "working great" because he had neither

felt depressed nor experienced mania. (Tr. 436). Similarly, on October 8, 2013, Plaintiff stated that he was "doing great" and that his "mood swings [were] in control." (Tr. 432). On November 21, 2013, Plaintiff reported that he had started a full-time job at Home Depot, and that he was doing well. (Tr. 427). On January 21, 2014, Plaintiff noted that he was "stable" and that he "had no mood swings ups and down." Plaintiff also reported that his focus was good, and that his job was going well. (Tr. 419). Upon mental status examinations at these visits, Plaintiff was cooperative and pleasant. (Tr. 436). Plaintiff was talkative and engaging, made good eye contact, was euthymic, and his affect was congruent. (Tr. 419, 427, 432, 436). Plaintiff did not show signs of tics, mannerisms, or abnormal movements.

On February 12, 2014, Plaintiff arrived early to his appointment because he "had a couple of bad days," where he "felt like he did not want to do anything." (Tr. 415). Plaintiff informed Dr. Nodal that he spent two days at home rather than going to work. But Plaintiff also told Dr. Nodal that he went back to work for one day and was able to function well. Plaintiff stated that he was not at his optional functioning level. In the mental status examination, Dr. Nodal observed that Plaintiff's mood was "a little sad" and his affect was "a little constricted." (Tr. 415).

From March 17, 2014 through June 2014, Plaintiff stated that he was doing well. On March 17, 2014, Plaintiff reported "feeling very down [a] couple of weeks ago, but that ha[d] gone away." (Tr. 410). On April 29, 2014, Plaintiff reported that

he was "feeling well" and that he wanted to leave his job at Home Depot and work for the Department of Children and Families in a job in which he could utilize his college degree. (Tr. 404). On June 23, 2014, Plaintiff stated he was "really, really good." (Tr. 400). Notes of the mental status examinations during these visits indicate that Plaintiff was cooperative and pleasant, Plaintiff's mood was euthymic, and Plaintiff's affect was congruent. (Tr. 400, 404, 410).

In addition to his treatment notes, Dr. Nodal wrote a letter, dated May 21, 2014, stating:

> I have had the opportunity to treat [Plaintiff] for almost a year. This gentleman suffers from severe mental illness including bipolar disorder and attention deficit hyperactivity disorder. He has a hard time with impulsivity, concentration, mood swings, and keeping a job. He most recently was working at Home Depot, because of his swing and lability the [Plaintiff] had to quit that job recently. [Plaintiff] suffers from severe mental illness and because of his instability has not been able to keep a job despite his parents great support and help . . . . [Plaintiff], in my opinion, is not able to keep a job on an ongoing basis and therefore I strongly recommend that you consider him for disability.

(Tr. 458, 465).

On August 21, 2014, Plaintiff reported that he was moving back to Gainesville because his parents purchased a condominium for him and he accepted a job with the Department of Justice. (Tr. 394).

From October 15, 2014 through May 2017, psychiatrist Dr. Michael Marchese, M.D., treated Plaintiff. (Tr. 459-63, 502-22). On October 15, 2014, Plaintiff reported that he had a long history of ADHD, OCD, and depression. (Tr.

463, 522). Dr. Marchese assigned Plaintiff a Global Assessment of Functioning ("GAF") of 66. (*Id.*).

On January 7, 2015, Plaintiff was twenty minutes late to his appointment and informed Dr. Nodal that he decided to stop taking lithium. (Tr. 462, 521). Plaintiff reported that his mood was unchanged since his last visit. (*Id.*). Dr. Marchese noted that Plaintiff did not exhibit signs of psychomotor agitation or retardation. (*Id.*). Plaintiff's mood was generally euthymic but reactive, and his affect was constricted. (*Id.*). Plaintiff's thinking was minimally circumstantial, and his judgment and insight were poor. (*Id.*). Dr. Marchese assigned Plaintiff a GAF of 60. (*Id.*).

On February 5, 2015, Plaintiff reported that he received a promotion at work. (Tr. 461, 520). Plaintiff stated that he felt good because of the promotion, but he knew "that the mood won't last." (*Id.*). Plaintiff reported a significant improvement in mood and an improvement in energy, motivation, and ability to experience pleasure. (*Id.*). Plaintiff's mood was euthymic, he did not exhibit any signs of psychomotor agitation or retardation, and his affect was appropriate. (*Id.*). Dr. Marchese noted that Plaintiff was "psychiatrically stable. Depressive symptoms clearly improved. But unstable." (*Id.*). He assigned Plaintiff a GAF of 72. (*Id.*).

On April 3, 2015, Plaintiff told Dr. Nodal that he "had to swallow [his] pride and admit that [he] cannot maintain gainful employment." (Tr. 460, 519). He reported losing his employment with the probation office after two weeks. (*Id.*). He

informed Dr. Nodal that a two-week depressive episode was just resolving. (*Id.*). Dr. Marchese noted that Plaintiff's depressive symptoms had partially improved. (*Id.*). He also indicated that Plaintiff's thinking was minimally circumstantial. Plaintiff's mood was generally euthymic but reactive, and Plaintiff did not have any signs of psychomotor agitation or retardation. (*Id.*). Dr. Marchese assigned Plaintiff a GAF score of 54. (*Id.*).

On May 18, 2015, Plaintiff stated that one of his "blood brothers" was in the hospital dying from liver failure. (Tr. 518). Plaintiff reported a "worsening of mood" and a decline "in energy, interest, motivation and ability to experience pleasure." (*Id.*). Plaintiff did not show signs of psychomotor agitation or retardation. Plaintiff was occasionally tearful, and his speech was decreased in rate. (*Id.*). Plaintiff's mood was generally euthymic but reactive. (*Id.*). His thinking was minimally circumstantial, but Plaintiff was forgetful and lost his train of thought. (*Id.*). Dr. Marchese assigned Plaintiff a GAF of 54. (*Id.*).

On August 11, 2015, Dr. Marchese completed a Mental Residual Function Capacity Assessment. (Tr. 480-81). Dr. Marchese indicated that Plaintiff was severely limited in his ability to (1) remember locations and work-like procedures; (2) understand and remember very short and simple instructions; (3) understand and remember very detailed instructions; (4) carry out short and simple instructions; (5) carry out detailed instructions; (6) maintain attention and concentration for extended

periods; (7) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (8) to sustain an ordinary routine without special supervision; (9) work in coordination with or in proximity to others, without being distracted by them; (10) make simple-work related decisions; and (11) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.*).

He also determined that Plaintiff was markedly limited in at least two categories of social interactions, severely limited in two categories, and markedly to severely limited in one category of social interactions. (Tr. 481). Specifically, he found that Plaintiff was markedly limited in his ability to (1) interact appropriately with the general public and (2) ask simple questions or request assistance. (*Id.*) Plaintiff was markedly to severely limited in his ability to accept instructions and respond appropriately to criticism from supervisors. (*Id.*) Plaintiff was severely limited in his ability to (1) get along with coworkers or peers without distracting them or exhibiting behavioral extremes and (2) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (*Id.*)

In relation to the work-related functioning of adaption, Dr. Marchese opined that Plaintiff was markedly limited in his ability to respond appropriately to changes in the work setting and his ability to be aware of normal hazards and take appropriate

precautions. (Tr. 481). Dr. Marchese also opined that Plaintiff was severely limited in his ability to travel in unfamiliar places or use public transportation and his ability to set realistic goals or make plans independently of others. (*Id.*).

On August 11, 2015, Dr. Marchese also completed a Psychiatric Review Technique. (Tr. 482-93). Under listing "12.04 Affective Disorders," Dr. Marchese indicated that Plaintiff had disturbance of mood accompanied by depressive syndrome, manic syndrome, and bipolar syndrome. (Tr. 485). Dr. Marchese noted that Plaintiff had an anxiety-related disorder that was characterized by recurrent severe panic attacks manifested by sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once per week and recurrent obsessions or compulsions which were a source of marked distress. (Tr. 487). Dr. Marchese indicated that Plaintiff had a personality disorder that was evidenced by persistent disturbance of mood or affect. (Tr. 489). Dr. Marchese opined that Plaintiff had marked limitations in activities of daily living and extreme limitations in (1) maintaining social functions; (2) maintaining concentration, persistence, or pace; and (3) had repeated episodes of decompensation of extended duration. (Tr. 493).

On September 3, 2015, Plaintiff reported that he was intermittently depressed and could not get out of bed for days. (Tr. 516). Plaintiff indicated that there was no change in his mood, energy level, interest, or ability to experience pleasure since his

last visit. (*Id.*). On September 23, 2015, Plaintiff reported mild improvement in his mood since the last visit, and no change in energy level, interest, or ability to experience pleasure. (Tr. 515). Plaintiff was accompanied by his parents at this office visit, and Dr. Marchese noted that Plaintiff often wanted to interrupt his parents when they spoke. During both of the September 2015 office visits, Dr. Marchese indicated that Plaintiff did not show psychomotor agitation or retardation. (Tr. 515-16.). He was fully oriented with no deficit in either short- or long-term memory. (*Id.*). He was generally euthymic but reactive and his thinking was minimally circumstantial. (*Id.*). In his assessment, Dr. Marchese noted that Plaintiff's "depressive symptoms partially improved," and he assigned Plaintiff a GAF of 54 and 58. (*Id.*).

On October 15, 2015, Plaintiff complained of "intermittent bouts of acute depression." (Tr. 514). Plaintiff reported mild improvement in his mood since the last visit, and no change in energy level, interest, or ability to experience pleasure. (*Id.*). The objective observations remained the same as the pervious observations. (*Id.*). In his assessment, Dr. Marchese noted that "depressive symptoms partially improved" and assigned Plaintiff a GAF of 60. (*Id.*).

On January 20, 2016, Plaintiff met with Dr. Marchese and was accompanied by his parents. (Tr. 512). Plaintiff reported no mood change from his last visit and no change in energy level, interest, or ability to experience pleasure. (*Id.*). Dr.

Marchese noted that Plaintiff exhibited psychomotor agitation. (*Id.*). Plaintiff was mildly hostile and often interrupted others. (*Id.*). Plaintiff's mood was generally euthymic but reactive. Plaintiff's thinking was "circular, and persevaritive [sic]." (*Id.*). Plaintiff was forgetful and often lost his train of thought. (Tr. 512). His judgment and insight were fair to poor. (*Id.*). In his assessment, Dr. Marchese noted that "depressive symptoms partially improved" and assigned Plaintiff a GAF of 64. (*Id.*).

On February 23, 2016, Plaintiff complained that he was not doing well, he needed help, and he was crying all the time. (Tr. 511). Plaintiff stated that he had spent most of his time on the couch and had showered for the first time in days. (*Id.*). Dr. Marchese noted that Plaintiff exhibited psychomotor agitation. (*Id.*). Plaintiff was forgetful and often lost his train of thought. (*Id.*). His judgment and insight were fair, and his thinking was minimally circumstantial. (*Id.*). In his assessment, Dr. Marchese noted that Plaintiff's depressive symptoms had not improved and assigned Plaintiff a GAF of 58. (*Id.*).

On March 29, 2016, Plaintiff described feeling "pretty good" and indicated he was even "happy." (Tr. 510). He stated that "the darkness came again" after getting food poisoning and not connecting with a family friend, but that it was not as bad as it had been in the past. (*Id.*). Plaintiff reported mild improvement in mood and improvement in energy, motivation, and ability to experience pleasure. (*Id.*). He also

reported a decline in irritability. Plaintiff did not exhibit signs of psychomotor agitation or retardation. (*Id.*). He was occasionally tearful. (Tr. 510). He was fully oriented with no deficit in short- or long-term memory. (*Id.*). His mood was generally euthymic but reactive. His thinking was logical, and goal directed and minimally circumstantial. (*Id.*). In his assessment, Dr. Marchese noted that "depressive symptoms partially improved" and assigned Plaintiff a GAF of 68. (*Id.*).

On July 12, 2016, Plaintiff reported mild improvement in mood, no depressive episodes, and improvement in his energy, motivation, and ability to experience pleasure. (Tr. 508). He informed Dr. Nodal that he completely switching his day and night schedule and had little socialization. (*Id.*). Plaintiff was fully oriented with no deficit in short- or long-term memory. (*Id.*). His mood was improving, and his affect was improved and less depressed. (*Id.*). His thinking was logical, and goal directed. Plaintiff did not exhibit signs of psychomotor agitation or retardation. (*Id.*). In his assessment, Dr. Marchese noted that "depressive symptoms partially improved" and assigned Plaintiff a GAF of 72. (Tr. 508).

On August 31, 2016, Plaintiff reported that he was becoming "reclusive." (Tr. 507). Plaintiff indicated that there had been no change in mood, energy level, interest, or ability to experience pleasure. (*Id.*). Plaintiff did not display psychomotor agitation or retardation. (*Id.*). He was fully oriented with no deficit in either short- or long-term memory. (*Id.*). Plaintiff's mood was euthymic but reactive. His thinking

was minimally circumstantial. (*Id.*). In his assessment, Dr. Marchese noted that Plaintiff was "psychiatrically stable" and isolated. (Tr. 507). Dr. Marchese assigned Plaintiff a GAF of 68. (*Id.*).

On October 4, 2016, Plaintiff reported that his mood was generally stable, but he was not doing much. (Tr. 506). Plaintiff reported mild improvement in mood and no change in energy level, interest, or ability to experience pleasure. Plaintiff did not show psychomotor agitation or retardation. (*Id.*). He was fully oriented with no deficit in either short- or long-term memory. (*Id.*). Plaintiff's mood was improving, and his affect was improved and less depressed. (*Id.*). In his assessment, Dr. Marchese noted that "depressive symptoms partially improved" and assigned Plaintiff a GAF of 66. (*Id.*).

On January 30, 2017, Plaintiff reported mild improvement in mood. He noted an improvement in energy, and ability to experience pleasure. (Tr. 504). He also reported a decline in irritability. (*Id.*). Dr. Marchese found that Plaintiff did not present with any signs of psychomotor agitation or retardation. (*Id.*). Plaintiff was fully oriented with no deficit in short- or long-term memory. (*Id.*). Plaintiff's mood was generally euthymic but reactive, and Plaintiff's thinking was minimally circumstantial. (*Id.*). In his assessment, Dr. Marchese found that Plaintiff was "psychiatrically stable" and assigned Plaintiff a GAF score of 68. (*Id.*).

At the May 10, 2017 office visit, Plaintiff reported no changes in his mood, energy level, interest, or ability to experience pleasure. Dr. Marchese noted that Plaintiff had "badly chewed fingernails" and "scratches on face." (Tr. 502). Plaintiff, however, did not present with any signs of psychomotor agitation or retardation. Plaintiff was fully oriented with no deficit in short- or long-term memory. His mood was generally euthymic but reactive. (*Id.*). In his assessment, Dr. Marchese noted that Plaintiff was "unchanged, limited functioning" and he assigned Plaintiff a GAF of 66. (*Id.*).

On June 6, 2015, state agency psychological consultant Dr. Alicia Maki, Ph.D., reviewed the record. Additionally, on September 1, 2015, state agency psychological consultant Dr. Barry Morris, Ph.D., also conducted a review of the record. These consultants' reports were very similar insofar as they both indicated that Plaintiff had the severe impairment of affective disorder and the non-severe impairments of ADD/ADHD and anxiety disorder. (Tr. 95, 106, 122, 134). Both psychologists found that Plaintiff did not meet either "paragraph B" or "paragraph C" criteria. (Tr. 96, 107, 122-23, 134-35). They opined that Plaintiff had (1) no restriction on activities of daily living, (2) mild difficulties in maintaining social functioning, (3) moderate difficulties in maintaining concentration, persistence, or pace, and (4) no repeated episodes of decompensation. (Tr. 96, 107, 123, 135). They

each found that Plaintiff was able to perform personal care without difficulty, although at times he lacked motivation. (Tr. 96, 107, 123, 135).

They also explained that Plaintiff was able to prepare simple meals, do light housework, walk, and drive. Plaintiff was capable of shopping and managing finances, which indicated that his cognitive ability was not impaired. (*Id.*). Both psychologists gave Dr. Nodal's letter "very little weight" as it was not substantiated by the Medical Evidence of Record ("MER") and "appear[ed] to be a letter of advocacy, [and did] not provide definite impairments that would impair [Plaintiff's] ability to work." (Tr. 97, 108, 123, 135). Dr. Morris also explained that, although Dr. Marchese completed a residual functional capacity questionnaire indicating severe limitations across the spectrum, he gave the form little weight as it appeared inconsistent with the rest of the evidence. (Tr. 123, 135).

Both state agency consulting psychologists opined that Plaintiff did not have any limitations with understanding and memory, social interactions, and adaptation. (Tr. 99, 110, 126, 138). But they concluded that Plaintiff suffered from limitations in sustained concentration and persistence. (*Id.*). Specifically, they found that Plaintiff was not significantly limited in his ability to (1) carry out very short and simple instructions, (2) sustain an ordinary routine without special supervision, (3) work in coordination with or in proximity to others without being distracted by them, (4) make simple work-related decisions, and (5) carry out detailed instructions. (*Id.*).

They also noted that he was moderately limited in his ability to (1) maintain attention and concentration for extended periods and (2) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.*). Finally, there was no evidence that Plaintiff was limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (*Id.*). They concluded that Plaintiff could (1) understand, carry out, and remember simple instructions; (2) "use judgment"; (3) respond appropriately to supervision, coworkers and usual work situations; and (4) deal with changes in routine work setting. (Tr. 100, 111, 126, 138). Neither Dr. Maki nor Dr. Morris examined Plaintiff. (Tr. 19). They also did not have the opportunity to review subsequent evidence proffered at the hearing. (*Id.*).

On August 18, 2017, psychologist, Dr. Richard Nay, Ph.D., examined Plaintiff and his medical records. (Tr. 538-546). Dr. Nay noted that Plaintiff had a broad affect and mildly dysthymic mood. Dr. Nay observed that Plaintiff possessed a "marked tendency to be quite talkative at times" and rambled but he could be redirected. (Tr. 539) Plaintiff was constantly fidgeting and moved around in his chair. (*Id.*). He would become tearful during the conversation but could compose himself after 1-2 minutes. Plaintiff had difficulty remembering specific dates and making decisions when answering questions. (*Id.*). Dr. Nay administered two tests—

the Mini-Mental State Examination ("MMSE") and Repeatable Battery for the Assessment of Neuropsychological Status ("RBANS")—to assess Plaintiff's cognitive functioning. He found that the results of the MMSE reflected that Plaintiff had "significant difficulties with delayed recall, even on a very simple verbal recall task." (Tr. 543). The results of the RBANS test reflected that Plaintiff had "significant, severe overall cognitive impairment." (*Id.*). Dr. Nay concluded that based on the records from Dr. Nodal and Dr. Marchese, the clinical interview, and the diagnostic testing performed, Plaintiff suffered from psychological impairments that would prevent him from working. (Tr. 544-45).

Based on his examination and review of the record, Dr. Nay completed a mental RFC assessment. (Tr. 548-49). Dr. Nay indicated that Plaintiff had moderate limitations in his ability to (1) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and (2) be aware of normal hazards and take appropriate precautions. (Tr. 549). Dr. Nay found that Plaintiff was markedly limited in his ability to (1) remember locations and work-like procedures; (2) understand and remember very short and simple instructions; (3) carry out short and simple instructions; (4) sustain an ordinary routine without special supervision; (5) work in coordination with or proximity to others without being distracted by them; (6) make simple-work related decisions; (7) interact appropriately with the general public; (8) ask simple questions or request assistance; (9) accept instructions and

respond appropriately to criticism from supervisors; (10) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (11) travel in unfamiliar places or use public transportation; and (12) set realistic goals or make plans independently of others. (Tr. 548-49).

Dr. Nay also indicated that Plaintiff had severe limitations in his ability to (1) understand and remember very detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (5) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and (6) respond appropriately to changes in the work setting. (*Id.*).

He also completed a psychiatric review technique. (Tr. 551-64). He found that Plaintiff met the listing for ADHD mixed type and equaled the listing for bipolar disorder not otherwise specified ("NOS"), and anxiety disorder NOS. (Tr. 551, 554). Dr. Nay also found that Plaintiff had marked limitations in his ability to interact with others and adapt or manage himself. (Tr. 562). Dr. Nay opined that Plaintiff had extreme limitations in his ability to understand, remember, or apply information and in his ability to concentrate, persist, or maintain pace. (*Id.*). Dr. Nay also found that

Plaintiff met the Paragraph C criteria. (*Id.*). He indicated that Plaintiff could "quickly become deeply depressed to the point of being dysfunctional." (Tr. 563).

On August 11, 2017, Dr. Marchese completed another Mental Residual Function Capacity Assessment. (Tr. 567-68). Dr. Marchese indicated that Plaintiff was severely limited in all work-related mental status tasks relating to understanding and memory. (Tr. 567). He concluded Plaintiff was markedly limited in one mental status task and severely limited in the other mental status tasks related to concentration and persistence. (Tr. 567-68). Dr. Marchese also opined that Plaintiff was markedly to severely limited in each work-related mental status task involving social interaction. (Tr. 568). Dr. Marchese concluded that Plaintiff's ability to adapt ranged from markedly limited to severely limited. (*Id.*).

### B. <u>Relevant Hearing Testimony</u>

Plaintiff's father, Dr. Curt Rausch, M.D., testified during the hearing. Dr. Rausch practices internal medicine and testified that he was familiar with the signs and symptoms of depression. (Tr. 83). Dr. Rausch testified that Plaintiff's primary diagnosis was bipolar depression with an emphasis on the depressive side and that Plaintiff had been having acute symptoms over the past five to ten years. (Tr. 74). He testified that Plaintiff could not maintain employment because of his poor job attendance as a result of his depression, and he noted that Plaintiff had been fired for absenteeism. (Tr. 75).

Dr. Rausch also testified regarding the effect that Plaintiff's mental illness had on Plaintiff's activities of daily living ("ADL"). He testified that Plaintiff's ability to perform ADL was dependent on his depression. If Plaintiff was not in a depressed state, Plaintiff could perform ADL, but when he was in a depressed state, Plaintiff was incapable of performing ADL. Dr. Rausch also testified that Plaintiff's depression affected his ability to keep his medical appointments, and that he noted that the insurance statements showed several "no-shows/no-calls" to appointments. (Tr. 76).

He testified that Plaintiff's depression would come "every other week for two or three days," but that Plaintiff could go three or four weeks before relapsing. (Tr. 77). He stated that during some months, Plaintiff's depression would be so severe that he would be unable to get out of bed for six to eight days. (Tr. 77). He noted that despite being prescribed several medications, Plaintiff has not had any sustained improvement. (Tr. 77). Dr. Rausch observed that during conversations, Plaintiff would digress, lose focus, and get distracted. (Tr. 81). Dr. Rausch also testified that when Plaintiff is depressed, he is "paralytic" and incapable of linear, rational thought. (Tr. 82). Dr. Rausch explained that when he used the term "paralytic," he meant that Plaintiff stayed in bed or on the couch, when he moved it was laborious, and his speech was slower and became less intelligible. (*Id.*). Dr. Rausch testified that Plaintiff's depression was the worst he had ever seen. (Tr. 83).

## V.    Discussion

Plaintiff essentially raises two issues on appeal: (1) whether the ALJ erred in classifying Dr. Rausch's testimony as a lay opinion instead of a medical opinion; and (2) whether the ALJ's erred in weighing the medical opinions (Doc. 15 at 1).

### A.    <u>Dr. Rausch's Testimony</u>

Plaintiff argues that the ALJ erred in treating Dr. Curt Rausch's opinion as a lay opinion when he instead should have treated it as a medical opinion. (*Id.*).

In his disability determination, the ALJ discussed Dr. Rausch's testimony and found that "the hearing testimony and opinion, given by the claimant's father, who testified that he is a doctor, is considered as a lay opinion and not as a medical opinion." (Tr. 19). The ALJ did not explain why the entirety of Dr. Rausch's testimony was treated as a lay opinion and not, even partially, as a medical opinion.

Plaintiff argues that Dr. Rausch's testimony and opinion should be treated as a medical opinion because Dr. Rausch is a licensed physician. (Tr. 19, 391). Additionally, he was actively involved in Plaintiff's treatment and was referred to as Plaintiff's primary care physician in treatment records. (Doc. 15 at 19; Tr. 19, 391, 444-45). Dr. Rausch's testimony also contained medical terminology, discussed the severity of Plaintiff's impairment in relation to Dr. Rausch's experience with other patients, and concerned Plaintiff's mental status and medical history. (Doc. 15 at 19; Tr. 82-83). Defendant argues that because Dr. Rausch gave "his opinion as

Plaintiff's father," the ALJ properly considered it a lay opinion. (Doc. 17 at 12). Neither party provided any authority in support of their respective positions.

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite the impairment(s), and [the claimant's] physical or mental restrictions." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011); *see* 20 C.F.R. §§ 404.1527(a)(1),[3] 416.927(a)(1). In addition to medical opinions, the ALJ must consider all the evidence in the record. This includes "non-medical sources" such as opinions from employers, spouses, relatives, and friends and can be used to show the severity of the claimant's impairments. 20 C.F.R. §§ 404.1513(d)(4), 416.913(d)(4); *see* SSR 06-03P, 2006 WL 2329939 (S.S.A. Aug. 9, 2006); *Osborn v. Barnhart*, 194 F. App'x 654, 666 (11th Cir. 2006) (holding that the testimony of a claimant's family member can be evidence of a claimant's subjective feeling of pain) (citing *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983)).

In Social Security cases, the primary distinction between a lay opinion and a medical opinion is whether the person providing the opinion is an acceptable medical

---

[3] Plaintiff filed his claim in 2015, so the applicable definition of "medical opinion" is found in 20 C.F.R. § 404.1527(a)(1), as opposed to 20 C.F.R. § 404.1513(a)(2), which applies to claims filed after March 27, 2017.

source (*i.e.*, a medical doctor or licensed psychologist). *See Ray v. Berryhill*, No. 17-137-DLB, 2018 WL 1937576, at *7 (E.D. Ky. Apr. 24, 2018) (affirming the ALJ's determination that the witness-father's opinion was a lay opinion when the ALJ "repeatedly indicated that Plaintiff's father was not a medical doctor and could not provide medical-opinion testimony"); *Williams v. Astrue*, No. 4:10-cv-1-MP/WCS, 2011 WL 2149507, at *12 (N.D. Fla. Apr. 25, 2011) (holding that it was an error to treat an opinion from an individual, who was not a medical doctor, as a medical opinion); *see also Roque v. Colvin*, No. 15-C-392, 2016 WL 1161292, at *5 (N.D. Ill. Mar. 22, 2016) (noting that generally "lay witnesses do not have medical training").

The plain language of 20 C.F.R. §§ 404.1527(a)(1) and 416.927(a)(1) does not limit the definition of "acceptable medical sources" only to medical professionals who are not related to the claimant. Likewise, no court has ever held that a relative of a claimant does not qualify as an "acceptable medical source" simply by virtue of his familial relationship. Presumably having a biological relationship to a claimant does not prevent a physician from using his medical judgment and training to treat or evaluate his relative. If such a physician utilizes his expertise to analyze a claimant's condition, that portion of his testimony that is based on his expertise would constitute an expert opinion. Furthermore, nothing precludes a witness from providing testimony that entails a recitation directly observed by the

witness and expert testimony based on the witness's specialized training.[4] That is, a witness can be both a fact witness and an expert witness.

In determining how to weigh "non-medical sources," one factor courts consider is whether the testifying professional evaluated the claimant in his professional capacity. *See Barry O. v. Comm'r of Soc. Sec.*, No. 1:18-cv-01624-LMM-JSA, 2019 WL 5490623, at *7 (N.D. Ga. July 17, 2019). In *Barry O.*, the plaintiff argued that the ALJ erred in evaluating plaintiff's wife's opinion as a lay opinion. *Id.* The plaintiff argued that his wife's opinion was entitled to greater weight than a mere "'lay opinion' because she ha[d] worked for the Social Security Agency as a vocational expert in the past." *Id.* The district court found that the ALJ "'correctly concluded that the Plaintiff's wife was not a *medical expert or otherwise qualified to give a medical opinion*[,]' thus warranting its characterization as a lay opinion under the circumstances." *Id.* (emphasis added). The district court also noted that the ALJ ultimately concluded that the plaintiff's wife's opinion was a lay opinion because her testimony was "based upon casual observation, rather than objective medical examination and testing." *Id.*; *see also Kandt v. Astrue*, No. 2701-

---

[4] To permit the Commissioner to consider a wide breadth of evidence, the Federal Rules of Evidence do not apply in Social Security proceedings. 42 U.S.C. § 405(b)(1); *Richardson*, 402 U.S. at 400, 91 S. Ct. at 1427. Even under the strictures of the Federal Rules of Evidence, however, a "witness can qualify as both a fact and expert witness and an expert may base an opinion on fact or data in the case that the expert has personally observed." *United States v. Christian*, 673 F.3d 702, 708 (7th Cir. 2012).

JAR, 2013 WL 615249, at *5 (D. Kan. Feb. 19, 2013) (noting that the ALJ considered the plaintiff's father's testimony to constitute a lay opinion even though he was a physician).

Here, the ALJ acknowledged that Plaintiff's father was a medical doctor and that records indicated Plaintiff's father had been "providing most of" Plaintiff's care for his physical impairments. (Tr. 19). Unlike most cases in which ALJs consider a family member's testimony to be a lay opinion, Plaintiff's father was a medical doctor and legitimately could provide a medical opinion. Additionally, the record indicates that Plaintiff's father was active in his son's psychiatric treatment. (Tr. 444-45, 512, 515). Further, Dr. Rausch testified regarding Plaintiff's diagnoses and the severity of Plaintiff's impairments. (Tr. 73-83). It appears, therefore, that at least some of Dr. Rausch's testimony should have been treated as a medical opinion.

Perhaps the ALJ had good reason to treat Dr. Rausch's opinion as a lay opinion despite Dr. Rausch being a medical doctor. But when an "ALJ fails to state with at least some measure of clarity the grounds for the decision," a court must "decline to affirm 'simply because some rationale may have supported the ALJ's conclusion.'" *Colon v. Colvin*, 660 F. App'x 867, 870 (11th Cir. 2016) (citing *Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984)). Without some explanation of the ALJ's decision that the entirety of Dr. Rausch's testimony constituted only a lay

opinion,[5] the court cannot determine that the proper legal analysis has been conducted and that the Commissioner's conclusions are legally correct under controlling law. *Hickle v. Comm'r of Soc. Sec.*, 539 F. App'x 980, 988-89 (11th Cir. 2013) (remanding when the ALJ did not identify what evidence in the record was inconsistent with the physician's opinion); *Kahle v. Comm'r of Soc. Sec.*, 845 F. Supp. 2d 1262, 1272 (M.D. Fla. 2012) ("[C]onclusory statements by an ALJ to the effect that an opinion is inconsistent with or not bolstered by the medical record are insufficient to show an ALJ's decision is supported by substantial evidence unless the ALJ articulates factual support for such a conclusion."). Accordingly, reversal and remand is appropriate to afford the ALJ an opportunity to adequately explain his determination or reconsider this evidence.

### B.    Weight of the Medical Evidence

Plaintiff next makes two arguments relating to the weight of the medical evidence. First, Plaintiff contends that the ALJ erred in discounting Dr. Nay's

---

[5] Plaintiff concedes that the ALJ was free to give Dr. Rausch's opinion less weight due to his potential bias, but argues that he must treat at least some of his testimony as a medical opinion. (Doc. 15 at 20). *See Skipper v. South Carolina*, 476 U.S. 1, 8, 106 S. Ct. 1669, 1673 (1986) (noting that the "testimony of more disinterested witnesses . . . would quite naturally be given much greater weight"); *United States v. Abel*, 469 U.S. 45, 51, 105 S. Ct. 465, 468 (1984) (noting that the trier of fact could give less weight to a witness who was shown to be biased); *Davis v. Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105, 1110 (1974) (noting that the "partiality of a witness" is always relevant as discrediting the witness and affecting the weight afforded to his testimony).

medical opinion. Second, Plaintiff argues that the ALJ erred in giving greater weight to the opinions of two state agency psychological consultants than the opinions of Dr. Nay, Dr. Marchese, and Dr. Nodal.

Credibility determinations are within the province of the ALJ. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005). In determining the weight to give medical opinions, an ALJ must consider several factors regarding medical opinions, including: (1) whether there is a treating relationship; (2) whether the physician examined the claimant; (3) the length of the treatment relationship and the frequency of examination; and (4) whether the medical opinion is from a specialist related to his area of specialty. *See* 20 C.F.R. § 416.927(c). "An opinion from a treating physician is generally entitled to substantial or considerable weight." *MacGregor*, 786 F.2d at 1053; *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004) (per curiam) (citing *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987)). A one-time examiner is not entitled to any special weight; however, an examining physician is generally entitled to greater weight than a non-examining consultant. *Huntley v. Soc. Sec. Admin.*, 683 F. App'x 830, 832-33 (11th Cir. 2017); *see McSwain*, 814 F.2d at 619 (noting that the opinions of one-time examiners are not entitled to deference or any special weight).

An ALJ may discount any medical opinion, including a treating physician's opinion, for "good cause." *MacGregor*, 786 F.2d at 1053. Good cause for

discounting a treating physician's report exists "when it is not accompanied by objective medical evidence or is wholly conclusory." *Crawford*, 363 F.3d at 1160 (quoting *Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th Cir. 1991)). Good cause for discounting a physician's opinion also exists when the opinion is contradicted by the physician's own records. *Winschel*, 631 F.3d at 1179 (quoting *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004)) ("This Court has concluded 'good cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."); *Crawford*, 363 F.3d at 1159-61 (holding that the claimant was not entitled to relief when several of the physicians' opinions were inconsistent with their treatment notes). Further, an ALJ is not bound by a physician's opinion on the ultimate issue— whether the claimant is disabled. *Symonds v. Astrue*, 448 F. App'x 10, 13 (11th Cir. 2011); *Gainous v. Astrue*, 402 F. App'x 472, 475 (11th Cir. 2010). Such an opinion is not binding because the ultimate issue of whether an individual is disabled is left to the determination of the Commissioner. 20 C.F.R. § 416.927(d); *Bell v. Bowen*, 796 F.2d 1350, 1353-54 (11th Cir. 1986).

When an ALJ discounts a treating physician's opinion, he "must clearly articulate the reasons" for doing so. *Phillips*, 357 F.3d at 1240-41. When weighing different medical opinions, an "ALJ must state with particularity the weight given

to each medical opinion and the reasons therefore." *Winschel*, 631 F.3d at 1179 (citing *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987) (per curiam)). As long as an ALJ articulates a specific justification for his decision, a court will not second guess the ALJ's decision to reject a medical opinion for "good cause." *Hunter v. Comm'r of Soc. Sec. Admin.*, 808 F.3d 818, 823 (11th Cir. 2015).

### 1. *Dr. Nay's Opinion*

Plaintiff alleges that the ALJ erred by giving the opinion of an examining psychologist, Dr. Nay, little weight. (Doc. 15 at 13-18). The Defendant argues in response that the ALJ properly discounted Dr. Nay's opinion because Dr. Nay relied on evidence outside the relevant time period, it was inconsistent with the record as a whole, and Dr. Nay was a one-time examiner not entitled to any special weight. (Doc. 17 at 9-11).

Dr. Nay examined Plaintiff on August 18, 2017. (Tr. 538-46). He also reviewed Plaintiff's medical record and administered at least two objective tests to measure Plaintiff's impairments related to cognitive functioning. (*Id.*). Based on this testing, Dr. Nay concluded that Plaintiff's attention index was in the average range of cognitive functioning, but Plaintiff performed poorly on the coding subtest. (Tr. 543). Dr. Nay opined that Plaintiff might be able to memorize strings of numbers but would have "poor focus to detail when any more complicated information is given, such as verbal information or visual-motor processing speed tasks." (*Id.*).

Additionally, Dr. Nay found that the cognitive testing showed that Plaintiff's immediate and delayed memory index scores fell within the very low range of cognitive functioning, which indicated severe deficits in short- and long-term memory. (*Id.*). He concluded that this was "entirely consistent" with his observations during the clinical interview. He found that the cognitive testing reflected significant, severe overall cognitive impairment. (*Id.*) This would be a "major impediment to any work setting and would require him to receive frequent cues and reminders, with multiple attempts at practice and rehearsal in mastering any new skill." (Tr. 544-45). Dr. Nay assigned a GAF score of 44 and opined that Plaintiff's highest GAF during the year would be 47. (Tr. 546). As noted above, Dr. Nay found Plaintiff had marked and severe limitations in 18 categories of work-related mental status tasks and moderate limitations in two. (Tr. 548-49).

The ALJ discounted Dr. Nay's opinions because Dr. Nay "relied on medical evidence from prior to the adjudicative period to form his opinion that claimant was 'completely and totally disabled from a psychological perspective' and was 'unable to perform any job duties on a five-days-per week, eight-hours-per day basis." (Tr. 14). The ALJ also explained that Dr. Nay's opinion was afforded little weight because it was inconsistent with the GAF scores in the record and the overall evidence of the record. (*Id.*).

Although an ALJ must consider all relevant evidence, including GAF scores, the "Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity of the mental disorder listings.'" *Wind v. Barnhart*, 133 F. App'x 684, 692 n.5 (11th Cir. 2005); *see Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1266 (11th Cir. 2019) (recognizing that GAF scores are not dispositive of a claim); *Lacina v. Comm'r, Soc. Sec. Admin.*, 606 F. App'x 520, 527 (11th Cir. 2015) (noting that the "Commissioner has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorder listings.'").

In July 2013, the SSA issued Administrative Message (AM)-13066. It acknowledged that the fifth edition of the *Diagnostic and Statistical Manual of Mental Disorder* eliminated the use of GAF scores,[6] but confirmed that GAF scores should be considered as opinion evidence and that an ALJ must specify what weight—if any—he assigns to the GAF scores. Soc. Sec. Admin., Global Assessment of Functioning (GAF) Evidence in Disability Adjudication, AM–13066 (July 22, 2013) REV (Oct. 14, 2014); *McLoud v. Barnhart*, 166 F. App'x,

---

[6] Additionally, courts have observed that the most recent edition of the DSM (DSM-V) "abandoned the use of GAF scoring noting 'its conceptual lack of clarity' and 'questionable psychometrics in routine practice.'" *Castro v. Acting Comm'r of Soc. Sec.*, 783 F. App'x 948, 950 n.3 (11th Cir. 2019).

410, 418 (11th Cir. 2006) (requiring an ALJ to consider what, if any, weight to accord the claimant's GAF score on remand). AM-13066 explains:

> The GAF is only a snapshot opinion about the level of functioning. It is one opinion that we consider with all the evidence about a person's functioning. Unless the clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.

AM-13066 § E.

A GAF score in the range of 41-50 indicates serious symptoms or impairments. (Tr. 18); *Kent v. Comm'r of Soc. Sec. Admin.*, 651 F. App'x 964, 966 n.4 (11th Cir. 2016) (citing *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* 30-32 (4th ed. 2000)). A score in the range of 51-60 indicates moderate symptoms. (Tr. 18). A score of 61-70 indicates mild symptoms, and a score of 71-80 indicates no more than slight impairments. (*Id.*); *Kent*, 651 F. App'x at 966 n.4.

The ALJ noted that Plaintiff had been assessed GAF scores between 44 and 72 by Dr. Marchese and Dr. Nay. (Tr. 18). Specifically, over the nearly three-year period Plaintiff was seen by Dr. Marchese, Dr. Marchese assigned Plaintiff a GAF score between 51-60 six times, 61-70 six times, and 71-80 two times. (Tr. 502, 504, 506-08, 510-12, 514-16, 518-22). These scores indicate that generally there were moderate to mild symptoms. *See Kent*, 651 F. App'x at 968. The ALJ gave the GAF scores significant weight.

While these scores remained largely consistent in indicating that Plaintiff suffered from mild to moderate symptoms, these GAF scores were assessed during times when Plaintiff's "depression was partially improved." (Tr. 502, 506-08, 510-16, 519). There is evidence in the record that when Plaintiff's depression was severe, he was unable to function and leave his home.[7] (Tr. 70-72, 75-83, 377, 415, 440, 503, 505, 509, 513, 517). Thus, the mere fact that these snapshots of Plaintiff's functioning—at times when his depressive symptoms were "partially improved"— does not necessarily conflict with an opinion of a physician that Plaintiff's mental impairments may cause more severe limitations on his ability to work. *See Schink*, 935 F.3d at 1267 (noting that people with chronic diseases have good and bad days and when bad days "occur with some frequency, they can severely affect a person's ability to work").

Additionally, the ALJ concluded that Dr. Nay's opinion was inconsistent with the record as a whole. The ALJ generally cited to the non-examining consultants' opinions, and the opinions of Dr. Rivera, Dr. Nodal, and Dr. Marchese. (*Id.*). Both of the non-examining consultants did not review the full record insofar as their opinions were rendered in June and September 2015. (Tr. 14). Thus, they did not have the ability to review the evidence of Plaintiff's symptoms and behaviors from

---

[7] The ALJ discredited Plaintiff's testimony regarding the severity of the limitations insofar as it was inconsistent with the medical records. If the ALJ elects to treat some of Dr. Rausch's testimony as a medical opinion this could change.

2016 through 2017. In addition, they did not have the results of any cognitive testing. The record reflects that only Dr. Nay administered any cognitive testing. Thus, the non-examining consultants' opinions were not based on a complete record.

Furthermore, the ALJ found that the records of Dr. Nodal and Dr. Rivera—both of whom saw the Plaintiff prior to his onset date—were inconsistent with Dr. Nay's opinion. But the ALJ did not cite any specific inconsistencies. Furthermore, during a period when a plaintiff was not disabled, his impairments likely would not be as severe as during a period when he is disabled. His medical records presumably would reflect that. Focusing on medical records from a period when a plaintiff concedes he was not disabled, therefore, may not be fruitful to a sound analysis.

In addition, the ALJ broadly indicated that Dr. Nay's opinion was inconsistent with Dr. Marchese's opinion. But the ALJ did not point to any specific inconsistencies. Dr. Marchese generally did not observe a "deficit in short- or long-term memory," (Tr. 14, 502, 504, 506-08, 510, 514, 515-16), but there were times where Plaintiff was forgetful and lost his train of thought. (Tr. 14, 511-12, 518). The record also does not indicate that Dr. Marchese administered any form of objective cognitive functioning tests. *MacGregor*, 786 F.2d at 1054 (noting "that the Secretary by his regulations prefers testimony supported by testing or clinical findings to unsupported testimony").

Because the ALJ did not clearly identify the inconsistencies in the record, reversal and remand is appropriate so that the ALJ is afforded an opportunity to address this issue.

### 2.    *Dr. Marchese's Opinion*

With respect to Dr. Marchese's opinion, the ALJ found that Dr. Marchese's Mental Residual Function Capacity Assessments were entitled to little weight. The ALJ explained that he "recognize[d] Dr. Marchese as a treating source" but that his opinions were "inconsistent with the GAF scores he assessed as well as with the overall evidence of the record." (Tr. 13). Plaintiff argues that the ALJ erred because a GAF score should not have been used to discount a treating physician's detailed opinion and the ALJ did not cite evidence in the record that was inconsistent with Dr. Marchese's opinion.

In *Kent v. Comm'r of Soc. Sec. Admin.*, the Eleventh Circuit noted that the ALJ's conclusion that a treating psychiatrist's opinion contradicted his own treating notes and the record as a whole was supported by the record because a "routine assessment of 'fair' memory, judgment, and insight, along with mild to moderate GAF scores, does not coincide with 'extreme' or 'marked' functional limitations." 651 F. App'x at 967. The court, therefore, held that the ALJ "committed no error" in weighing the treating psychiatrist's opinion. *Id.* at 968.

Here, in addition to noting that Dr. Marchese routinely assigned Plaintiff GAF scores that corresponded with moderate to mild limitations, the ALJ found that Dr. Marchese routinely stated that Plaintiff suffered no "deficit in short term or long term memory," (Tr. 14, 502, 504, 506-08, 510, 514, 515-16), but sometimes Plaintiff was forgetful and lost his train of thought. (Tr. 14, 511-12, 518). Additionally, the ALJ found that Dr. Marchese routinely noted Plaintiff to have fluent speech, no perceptual disturbances, and "fair" insight and judgment. (Tr. 15, 502-22). The ALJ also stated that "although Plaintiff did experience some mood swings (a good mood when he obtained a promotion followed by frustration when he lost that job after only two weeks, for example), there was generally little variation in objective observations." (Tr. 18). As in *Kent*, the routine assessment of mild to moderate GAF scores and the generally consistent objective findings noted above, do not coincide with extreme or marked functional limitations. Thus, the evidence does support the ALJ's conclusion that Dr. Marchese's opinion was inconsistent with his GAF scores and the objective mental status examinations in his own medical notes.

### 3.    *Dr. Nodal's Opinion*

Plaintiff also argues that the ALJ improperly discredited Dr. Nodal's opinion that Plaintiff had a hard time keeping a job because he struggled with impulsivity, concentration, and mood swings. (Tr. 458, 465). Dr. Nodal also determined that, due to Plaintiff's behavior, Plaintiff likely would have difficulty keeping a job. (*Id.*).

The ALJ recognized that Dr. Nodal "was a treating source," but gave Dr. Nodal's opinion little weight because "Dr. Nodal [did] not specify how the claimant's impairments limit his functioning and preclude him from working." (Tr. 18). He also found that Dr. Nodal's opinion was inconsistent with Dr. Nodal's own treatment records and the record as a whole. Throughout his decision, the ALJ observed that Dr. Nodal's treatment notes reflected overall normal mental status examinations, (Tr. 14-15), and that Plaintiff reported doing well at many exams. (Tr. 18). The ALJ acknowledged that, despite the overall normal mental status examinations, in July and August 2013, Plaintiff appeared depressed. (*Id.*). Additionally, in February 2014, Plaintiff stated that he had a bout of depression and did not want to do anything. At this appointment, Plaintiff informed Dr. Nodal that he missed two days of work, but he subsequently returned to work and was able to function well. (*Id.*).

Plaintiff argues that this lends credit to, rather than detracts from, Dr. Nodal's opinion that Plaintiff suffered from mood swings and that Plaintiff's behavior and lability would impact his ability to work. Here, the ALJ cited to more than a scintilla of evidence that indicated that Dr. Nodal's opinion was inconsistent with his own records. Although evidence in the record arguably exists to support a decision contrary to that reached by the ALJ, the court is limited in its inquiry and is not empowered to reweigh the evidence. *See generally Martin*, 894 F.2d at 1529  (the

reviewing court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner); *Sewell*, 792 F.2d 1065, 1067 (11th Cir. 1986) (even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence). Even if the ALJ failed to cite to inconsistencies with the record as a whole as Plaintiff argues, the ALJ may properly discount a physician's opinion when it is internally inconsistent. *See Winschel*, 631 F.3d at 1179 (quoting *Phillips*, 357 F.3d at 1240-41). Thus, the evidence supports the ALJ's determination that Dr. Nodal's opinion was inconsistent with his own records.

## VI. Conclusion

For the reasons set forth above, the undersigned concludes that the Commissioner's decision fails to provide sufficient reasoning to determine that the proper legal analysis has been conducted, and the Commissioner's decision should not be affirmed. *See* 42 U.S.C. § 405(g). The undersigned concludes that a remand is necessary so that the ALJ can address Dr. Rausch's testimony Dr. Nay's opinion.

Accordingly, the undersigned respectfully **RECOMMENDS**, that:

1. Pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be **REVERSED**, that this action be **REMANDED** to the Commissioner to conduct further proceedings consistent with this report and recommendation.

2.    The clerk of the court be directed to close the file.

At Panama City, Florida, this <u>26th</u> day of February, 2020.

/s/ *Michael J. Frank*

**Michael J. Frank**
**United States Magistrate Judge**

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.</u> A copy of any objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3- 1; 28 U.S.C. § 636**.